**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**ORLANDO DIVISION**

UNITED STATES OF AMERICA,

    Plaintiff,

v.                                                          Case No. 6:24-cr-39-WWB-RMN

STEVEN PAUL MCINALLY,

    Defendant.

## DEFENDANT'S SENTENCING MEMORANDUM

Defendant Steven Paul McInally, through undersigned counsel, submits this Sentencing Memorandum for the Court's consideration. Mr. McInally's conduct is severe, and his advisory guidelines range is relatively high. In this case, however, a prolonged sentence of incarceration in the United States would not serve the ends of justice. Mr. McInally, a citizen of the United Kingdom (Scotland), was sexually victimized as a child. (PSI Report at 21–24.) The trauma of this childhood incident affects Mr. McInally to this day. Moreover, Mr. McInally has no connection to the United States besides having been arrested at an American airport. (*Id.*, ¶ 7.) Imprisoning Mr. McInally in the United States for a long period of time—at significant cost to the American taxpayer—would prevent Mr. McInally from facing justice in his home country and hinder the identifiable victims of his offense from confronting him in a Scottish court. A lengthy sentence also would deprive Mr. McInally of his best opportunity for rehabilitation. Such an opportunity could only exist in his home country—where Mr. McInally would be more familiar with the culture and legal institutions, and his loved ones would be better able to support him. For these reasons, Mr. McInally respectfully asks that the Court to impose concurrent

sentences of five years on both counts—or at least a total sentence no greater than 10 years. ***To be clear, a federal five-year sentence in would not end Mr. McInally's legal issues***. He still would have to face charges in the United Kingdom, where law enforcement has concluded a separate investigation against him and referred his case to Scotland's public prosecution service. He also continues to face state court charges in Florida's Eighteenth Judicial Circuit (Case No. 05-2023-CF-044022). In the present case, however, a five-year sentence is sufficient to serve the ends of justice given the unique background of this case. The best deterrent for Mr. McInally, and other foreign nationals like him, is deportation. *See* Exec. Order No. 14157, *Securing Our Borders* (Jan 20, 2025), *https://www.whitehouse.gov/presidential-actions/2025/01/securing-our-borders.*

## **BACKGROUND & PROCEDURAL HISTORY**

Mr. McInally is a citizen of the United Kingdom. (PSI Report, ¶ 7.) While traveling to the United States on vacation in 2023, he was arrested at Melbourne Orlando International Airport after Customs and Border Patrol performed a border search on his phone and found child sexual abuse material. (*Id.*) According to a report from the Department of Homeland Security, the Government's original plan was to deny Mr. McInally entry into the United States and place him "under a courtesy hold until the next flight back to the United Kingdom." (App. D.) For whatever reason, Mr. McInally was never deported. Instead, he was charged by information in Florida's Eighteenth Judicial Circuit on September 18, 2024. That case remains pending. (PSI Report, ¶ 6.) Mr. McInally was federally indicted on February 14, 2024, for one count of transportation and one count of possession of child pornography. (*Id.* ¶ 1.) On November 1, 2024, Mr. McInally entered an open plea to both counts of the Indictment. (*Id.* ¶ 5.)

**SENTENCING FACTORS**

**I.     Mr. McInally Was Sexually Victimized As A Child.**

Due to the stigma attached to child pornography offenses, it is easy to forget that people who commit such offenses often were victimized themselves. To be sure, suffering from childhood sexual abuse is not an excuse for committing sexual offenses in adulthood. But, as a matter of empirical fact, male sex offenders report a much higher rate of sexual abuse than other men. *See Sex Offender Management Assessment and Planning Initiative* at 42, U.S. Department of Justice (March 2017) (explaining that while a majority of sex offenders do not report being abused as children, male sex offenders do have "higher rates of sexual abuse in their histories than would be expected in the general population," and "[f]or those victims who later become perpetrators, the majority are male").[1] Studies suggest that a male victim who internalizes thought patterns such as "this must be normal" or even "this feels good" may be at risk of engaging in sexually abuse behavior later in life. *Id.*

Mr. McInally is no exception. As the psychological evaluation appended to the PSI Report states, Mr. McInally was sexually abused as a child. (PSI Report at 21–24.) At age 11, Mr. McInally was admitted to the Dance School of Scotland—a prestigious boarding school in Glasgow that trains aspiring young dancers. (*Id.* at 21.) While attending the boarding school, Mr. McInally visited his parents' home on the weekends while by taking a train. (*Id.*) When he was approximately 13 years old, Mr. McInally was sexually assaulted on the train ride home by an older man. (*Id.*) This incident had a seismic impact on Mr. McInally's life. He never told his parents about the incident. (*Id.*)

---

[1] https://smart.ojp.gov/sites/g/files/xyckuh231/files/media/document/somapi_full_report.pdf.

3

The Dance School of Scotland was planning set up therapy for Mr. McInally, but the trauma of the incident led to him losing interest in dance and ultimately getting expelled from the school, so he never received any therapy.  (*Id.*)

As a coping mechanism, a then-teenage Mr. McInally began to look at pictures of young girls in swimsuits.  (*Id.* at 22.)  This practice began as an attempt by Mr. McInally to resolve his confusion about his sexuality and the role he played in the incident on the train.  (*Id.*)  He wondered if his abuser had targeted him because he was giving off "gay vibes."  (*Id.*)  The stigma of being a dance student did not help.  Mr. McInally's subsequent classmates—as well as members of his own family—assumed that Mr. McInally was gay because he had been involved in dance.  (*Id.* at 21–22.)

Mr. McInally's coping mechanism "was not an effective strategy because it did not help him to understand and heal from his traumatic experience, but it apparently helped him to avoid or escape distressing thoughts and feelings by focusing on those images."  (*Id.* at 22.)  Either way, this coping tactic stuck with Mr. McInally through his adult life.  As Mr. McInally laments, "***It's almost like I'm stuck at that age***."  (*Id.*)  Other coping mechanisms, like alcohol and gambling, proved equally ineffective.  (*Id.* at 25–26.)  To this day, Mr. McInally experiences symptoms of post-traumatic stress from the incident, including one incident that led to his family filing a missing person report after he got into a car and simply drove for hours.  (*Id.* at 23.)  He still experiences anxiety when riding the train.  (*Id.* at 24.)  Mr. McInally even experiences discomfort when his long-term female romantic partner tries to initiate sex with him.  (*Id.*)  Clearly, his childhood abuse has had a profound impact on his adult life.

Mr. McInally's psychological evaluation explains how abuse victims reenact trauma as a way to understand their own experience. The evaluation explains:

> Reenactment of a trauma is a way that a person may try to understand and come to terms with the trauma. Sometimes this leads to promiscuity, pornography addiction, or even sexual abuse of children. Reenactment may involve a victim of sexual abuse now becoming the abuser, as a means of trying to understand what happened and what the abuser was thinking and feeling. Taking the more powerful role may reduce feelings of helplessness associated with the trauma, but it tends to lead to more confusing thoughts and feelings associated with the abuse. Reenactment may have contributed to Mr. McInally's behavior in this case.

(*Id.* at 23.)

Mr. McInally asks the Court to consider his own history of abuse when deciding his sentence. This abuse does not provide a legal excuse for Mr. McInally's actions. But it does help explain why he may have taken those actions. Perhaps if Mr. McInally had received support and therapy when he was a vulnerable child himself, his life would have taken a different direction. Unfortunately, that is not what happened. Mr. McInally grew up at a time when attitudes about victims of sexual assault were much different than they are now. So he ultimately did not receive the help and support that he needed before he committed the crimes charged in the Indictment. Nevertheless, Mr. McInally is not a one-dimensional person. He is both the man who admitted to the offenses in the Indictment, and the child who was once abused himself. Mr. McInally asks that the Court recognize this reality as it evaluates an appropriate sentence.

## II. Mr. McInally Has No Connection to The United States, And A Lengthy Prison Sentence In This Country Would Not Serve The Ends Of Justice.

Mr. McInally is a citizen and resident of the United Kingdom. (PSI Report, ¶ 7.) He was arrested at Melbourne Orlando International Airport in a country that he is not a citizen of and otherwise has no relation to. He admits to committing a crime in the United

States, but all identifiable victims of this crime remain in the United Kingdom. (PSI Report, ¶ 12.) Mr. McInally's family, friends, and sources of support also remain in the United Kingdom. Keeping Mr. McInally jailed in the United States makes no sense from either a retributive or rehabilitative perspective because: (1) Mr. McInally ultimately should be made to face justice in his home country; and (2) Mr. McInally's best chance for rehabilitation likewise is in his home country.

### A. Mr. McInally Will And Should Face Justice In His Home Country.

All identifiable victims of Mr. McInally's crimes reside in Scotland. (PSI Report, ¶ 12.) Undersigned counsel has been informed by Mr. McInally's counsel in the United Kingdom (Marissa Borland at Bridge Legal Glasgow) that Police Scotland (Scotland's national police force) has completed its investigation of Mr. McInally and referred the case to the Crown Office and Procurator Fiscal Service (Scotland's public prosecution service). The Crown Office, in turn, is waiting to see what happens in the present case before filing charges against Mr. McInally in Scotland. Undersigned counsel's communications with the Government have further confirmed that Police Scotland's investigation is complete, and the Crown Office is waiting for the completion of this case to file charges. Even the Scottish media has covered Mr. McInally's arrest.[2]

Production of child pornography is a crime in the United Kingdom generally and Scotland in particular. *See* Civic Government (Scotland) Act 1982, § 52(1) (Scot.), https://www.legislation.gov.uk/ukpga/1982/45/section/52. Moreover, the United Kingdom and Scotland have a highly developed legal system that appreciates victims' rights. The

---

[2] Emma O'Neill, *Scots soft play boss to go on trial in US over child sex abuse images*, Daily Record (Jan 8, 2024), https://www.dailyrecord.co.uk/news/scottish-news/scots-soft-play-boss-go-31831994

Victims' Code for Scotland provides victims with the right to provide a statement in criminal proceedings, the right to provide their views to the Scottish Prison Service when an offender is being considered for release, and the right to receive support when testifying tin Court. *See* The Scottish Government, *Victims' Code For Scotland* (2018).[3]

Imposing a prolonged sentence of incarceration on Mr. McInally prevents him from facing justice in Scotland—which he will do as soon as he is deported. His victims, too, will lose their right to confront Mr. McInally on their own terms. For better or worse, their memories may fade. Mr. McInally's ability to provide the victims with restitution, to the extent he has any such ability, will degrade. Simply put, it does not make sense for the United States to do the work of the Scottish justice system.

The PSI Report underscores the irrationality of keeping Mr. McInally imprisoned for a prolonged period of the United States. Paragraph 97 of the PSI Report describes the daily, monthly, and annual cost of incarcerating Mr. McInally. The cost is as follows:

|  | Bureau of Prisons Facilities | Community Correction Centers | Supervision by Probation Officer |
|---|---|---|---|
| Daily | $136.00 | $107.00 | $12.00 |
| Monthly | $4,147.00 | $3,266.00 | $366.00 |
| Annually | $49,770.00 | $39,197.00 | $4,387.00 |

(PSI Report, ¶ 97.) The numbers speak for themselves. Mr. McInally may have committed a crime in the United States by setting foot on American soil with a cellphone that contained child sexual abuse material, but the American taxpayer should not have to pay $50,000 dollars a year for Mr. McInally to be warehoused in an American prison for an excessively long period of time. Mr. McInally should receive a sentence that reflects

---

[3] https://www.mygov.scot/binaries/mygov/browse/crime-justice-law/contact-police-victim-support/victim-witness-rights/documents-victims-code/victims-code-for-scotland/victims-code-scotland.pdf

the seriousness of his crime in the United States but also allows him to be deported expeditiously, face responsibility for his actions in his home country, and be confronted by the people that he victimized.

### B. Mr. McInally's Best Opportunity For Psychological And Physical Rehabilitation Is In His Home Country.

Mr. McInally's best potential for rehabilitation (psychological and physical) also lies in Scotland. His entire family still lives there (PSI Report, ¶ 63), and several of them have written letters of support to the Court (described below). Keeping Mr. McInally imprisoned an ocean away from his loved ones—and from the culture that he is most familiar with—severely undermines Mr. McInally's chances of rehabilitation. *See generally* Johanna B. Folk et al., *Behind Bars but Connected to Family: Evidence for the Benefits of Family Contact During Incarceration*, Journal of Family Psychology (2019) (discussing rehabilitative benefits of family ties and visitation).[4]

Mr. McInally's health record since being detained in the United States underscores that his best chance for being rehabilitated is in his home country. Shortly after his initial detention in Brevard County, Mr. McInally unsuccessfully attempted suicide. (PSI Report, ¶ 72; App. B at 16.) He also has experienced seizures, a problem that he never suffered from in Scotland. (PSI Report, ¶ 70; App. B at 12, 16.) And treating these issues would not even begin to address the serious psychiatric therapy that Mr. McInally will need to address his childhood trauma and dissipate his affinity for child pornography. To be clear, **Mr. McInally is not the victim**—or at least not the only victim—in this scenario. But his opportunity for rehabilitation is a factor that this Court must consider when imposing a

---

[4] https://pmc.ncbi.nlm.nih.gov/articles/PMC6625803/pdf/nihms-1024120.pdf

8

sentence. 18 U.S.C § 3553(a)(2)(D). Mr. McInally respectfully asks the Court to consider that his best chances for rehabilitation are in his home country.

### C. There Is Little Or No Deterrent Value To Giving Mr. McInally A Lengthy Prison Sentence.

The Government likely will argue that sentencing Mr. McInally to a lengthy and expensive prison sentence in the United States will serve as a deterrent to other foreign nationals. Any such deterrent value is minimal at best, or nonexistent at worst. It is not reasonable for the Court to assume that Mr. McInally's sentence will lead to foreign nationals researching federal child pornography law in the United States—particularly foreign nationals from countries where English is not the national language. As the current presidential administration recognizes, the best deterrent for people like Mr. McInally is deportation. *See* Exec. Order No. 14157, *Securing Our Borders* (Jan 20, 2025) (setting forth the United States' policy to detain foreign nationals to the maximum extent authorized by law, but only "until such time as they are removed from the United States," and also to remove "promptly all aliens who enter or remain in violation of Federal law"), *https://www.whitehouse.gov/presidential-actions/2025/01/securing-our-borders*.

### III. Despite His Serious Charges, Mr. McInally Continues To Have The Support Of His Family.

Several of Mr. McInally's family members have written to the Court to beg for a lenient sentence. Their letters underscore the value of deporting Mr. McInally to Scotland as soon as practically possible.

Mr. McInally's father, Steven Sr., writes about the sacrifices he made to allow his children to flourish. (App. A-1 at 1.) He describes how Mr. McInally showed an interest in music and dancing but became isolated due to peer pressure and bullying. (*Id.*) He

writes about how Mr. McInally "was unable to settle in a profession, and continually changed until he developed his life skills so that society accepted him." (*Id.*) Steven Sr. clarifies that the family is "shocked and disappointed in Steven for his actions" and understands "the severity of the case against him, together with the seriousness of the charges and the sentence that will be dictated at some point." (*Id.* at 2.) Nevertheless, he requests "leniency to be considered for [Mr. McInally]" because, as he writes, "family is important to me, my family, to Steven, to Michelle and his children and to everyone else in this world." (*Id.*) Steven Sr. also highlights that Mr. McInally "is going to be punished in Scotland for what he did." (*Id.*)

Mr. McInally's partner, Michelle McCall, writes that Mr. McInally plays a "father figure" role to her son from a previous relationship (Jayden). (App. A-2 at 1.) She writes that Mr. McInally has been with her "through the ups and downs" when she lost her mother and when she discovered that her two sons have heart conditions. (*Id.*) Mr. McInally also supported his children in their schoolwork and athletic activities. (*Id.*) Ms. McCall clarifies that the children have (understandably) not been informed of the full extent of the charges against Mr. McInally. (Id. at 2.) All they see is that "the most important person in their [lives] has been [taken] away from them and they can't talk to him." (*Id.*) Ms. McCall concludes that she "understand[s] what [Mr. McInally] is being charged with" and is "not making light of any of it." (*Id.*) She acknowledges that this ordeal "has been truly a nightmare for everyone," and that she has moments when she feels "anger, sadness, and betrayal." (*Id.*) But she also has moments when she "remember[s] the loving man that [she] fell in love with." (*Id.*) She concludes by writing that keeping Mr. McInally in America "is making more people suffer that didn't ask for any of this." (*Id.*)

10

Two of Mr. McInally's older children also have written to the Court. Both of them have been deeply impacted by Mr. McInally's absence and want him to come home.

Jayden (age 16) writes that Mr. McInally was "the man that raised [him]." (App. A-3 at 1.) He explains that Mr. McInally has a big heart and donated to various charitable causes in Scotland. (*Id.*) Jayden describes Mr. McInally as the "rock" to the family, and that his mother (Michelle) does not trust anyone else the way that she trusted Mr. McInally. (*Id.*) He states that Mr. McInally has helped him through bullying and learning that he has dyslexia. (*Id.*) Jayden laments that the family has gone through two Christmases without their father, and that he cannot directly communicate with his father in jail because he is under eighteen years old. (*Id.*) Jayden says he "understands" what his father has done and that "[n]othing excuses what he did," but that his actions are "out of character." (*Id.* at 2.) Jayden concludes by writing that the family "need[s] him to come back" so that he can play some kind of role in his children's lives. (*Id.*)

Leighton (age 14) wrote his letter in the form of a statement to his father. (App. A-4.) He writes that Mr. McInally has been an "amazing father" and that he "wouldn't be the person [he is] today without [him]." (*Id.*) Leighton writes that Mr. McInally has "always been there . . . no matter what" and always "made [him] feel loved and supported." (*Id.*) He thanks Mr. McInally for "believing him [him], and for showing [him] what it means to be a good person." (*Id.*) Leighton says that he is "proud" to call Mr. McInally his father and wants him to "come home so [he] can see [him] again." (*Id.*)

## CONCLUSION

Mr. McInally accepts responsibility for his actions, which are very serious and deserving of accountability. But these actions must be understood in the context of his

11

own victimization, which mirrors the conduct for which he now faces judgment. Mr. McInally has spent much of his life carrying the weight of his own sexual trauma without access to the support or tools necessary for him to lead a normal life.

Adding to this complexity, Mr. McInally is a foreign national who was arrested at an airport while vacationing in the United States. He has no familial or community ties to this country. Given this reality, a lengthy period of incarceration in the United States would serve little practical purpose while imposing a significant financial burden on American taxpayers. Prolonged imprisonment here would isolate Mr. McInally from the rehabilitative, legal, and cultural resources available in his home country and—more importantly—delay justice for his victims in Scotland.

A fair and measured sentence should consider the entirety of Mr. McInally's circumstances, including his victimization, his foreign status, and the fact that he will face further prosecution in his home country. Justice can be achieved in this case without sentencing Mr. McInally to an unnecessarily lengthy term of incarceration in a country where **neither the victims nor the community stand to benefit**. Accountability, deterrence, and the potential for rehabilitation are best served by a sentence that reflects these realities and allows Mr. McInally to promptly face justice in the United Kingdom.

Mr. McInally respectfully asks the Court for a concurrent sentence of five years on both counts—or at least a total sentence no greater than 10 years.

(*Attorney Signature on Following Page*)

Dated: January 22, 2025                     Respectfully submitted,

                                                                       A. Fitzgerald Hall, Esq.
                                                                        Federal Defender, MDFL

                                                                        */s/Vitaliy Kats, Esq.*
                                                                        Vitaliy Kats, Esq. (FBN 0118748)
                                                                        Assistant Federal Defender
                                                                        201 South Orange Avenue, Suite 300
                                                                        Orlando, FL 32801
                                                                        Telephone: 407-648-6338
                                                                        vitaliy_kats@fd.org

## CERTIFICATE OF SERVICE

I certify that on January 22, 2025, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system, which will send a notice of electronic filing to counsel of record.

                                                                        */s/Vitaliy Kats, Esq.*
                                                                        Vitaliy Kats, Esq.